IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

PATRICIA FLATT,

      Plaintiff,

v.                                                                          No. 14-1060

AETNA LIFE INSURANCE COMPANY
OF HARTFORD, CONNECTICUT a/k/a
AETNA, INC.; FRED'S INC. WELFARE PLAN
and FRED'S SHORT TERM DISABILITY PLAN,

      Defendants.

_____

## MEMORANDUM OPINION
_____

### INTRODUCTION AND PROCEDURAL HISTORY

This matter was brought by the Plaintiff, Patricia Flatt, on March 19, 2014, against Aetna Life Insurance Company of Hartford, Connecticut, a/k/a Aetna, Inc. ("Aetna"); Fred's Inc. ("Fred's") Welfare Plan and Fred's Short-Term Disability Plan (referred to individually as the "Plan" and collectively as the "Plans"), alleging wrongful denial of short-term disability ("STD") and long-term disability ("LTD") benefits (Counts I and II), breach of fiduciary duty (Counts III and IV), and refusal to supply requested information (Count V), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as well as breach of contract (Count VI). In an order entered November 24, 2014, this Court dismissed (1) the claim for extra-contractual damages referenced in paragraphs forty-nine and fifty-six of the Complaint; (2) the claims alleged in Count VI of the Complaint; (3) breach of fiduciary duty claims against Aetna; and (4) claims for administrative penalties under 29 U.S.C. § 1132(c)(1). (D.E. 26.) The remaining issues relate to Flatt's claim for benefits pursuant to 29 U.S.C. § 1132.

Before the Court are the Plaintiff's Motion for Summary Judgment (D.E. 37) and the Defendants' Motion for Judgment on the Pleadings (D.E. 38). While the Defendants have responded to Flatt's motion (D.E. 41), Plaintiff has failed to respond to the Defendants' motion. As the time for such response has expired, the matter is now ripe for adjudication.

*THE ADMINISTRATIVE RECORD*

The following evidence is contained in the administrative record. Flatt was an employee of a Fred's store in Selmer, Tennessee and an enrolled participant in the Plans. She worked at the store for approximately fifteen years and, prior to making claims for STD and LTD benefits, was employed as a pharmacy technician. Her job consisted of "taking care of customers, answering phones, running the register, filling prescriptions, cleaning of the store and pharmacy, unloading deliveries, data entry and placement of stock" on pharmacy shelves. (Administrative Record ("AR") 000481.) It was considered a medium-duty occupation that required mental clarity, occasional lifting of materials weighing up to fifty pounds, regular lifting of material weighing approximately ten pounds, frequent reaching above shoulder height and below waist level and standing throughout the workday. Her position was "dangerous" for one with an inability to focus. (D.E. 42 ¶ 10.)

"Disability" is defined under the self-funded STD Plan as "any physical or mental condition arising from Injury, Illness, or pregnancy that renders a Participant incapable of performing the material duties of his or her regular job or any reasonably related job." (AR 000004.) The document provided that

> [t]he Plan Administrator will determine whether a Disability exists with respect to a Participant on the basis of (i) Objective Medical Evidence, (ii) a certificate from the Participant's Physician, or (iii) any such other information as the Plan Administrator, in its sole discretion, deems relevant to such determination.

Certificates from the Participant's Physician must contain (i) a diagnosis and diagnostic code prescribed in the International Classification of Diseases, or, where no diagnosis has yet been obtained, a detailed statement of symptoms, (ii) a statement of the medical facts within the Physician's knowledge, based on a physical examination and documented medical history of the Participant by the Physician, (iii) the Physician's conclusion as to the Participant's Disability, and (iv) a statement of the Physician's opinion as to the expected duration of the Disability.

(AR 000008.)  Under the Plan, "Objective Medical Evidence" means

a measurable abnormality which is evidenced by one or more standard medical diagnostic procedures including laboratory tests, physical examination findings, X-rays, MRIs, EEGs, ECGs, CAT scans or similar tests that support the presence of a Disability or indicate a functional limitation.  Objective Medical Evidence does not include physician's opinions based solely on the acceptance of subjective complaints, (e.g. headache, fatigue, pain, nausea), age, transportation, local labor market and other non-medical factors.  To be considered an abnormality, the test result must be clearly recognizable as out of the range of normal for a healthy population; the significance of the abnormality must be understood and accepted in the medical community.

(AR 000005.)  In order to be entitled to STD benefits,

a Participant must comply with such procedures and requirements as the Plan Administrator may have prescribed with respect to the completion and filing of an application for such benefits and submission of evidence that the Participant is entitled to such benefits.  The Plan Administrator may require information with respect to the Participant's . . . medical history . . . .

The Plan Administrator may require any other information reasonably relevant to a determination of whether the Participant is eligible to receive benefits . . .

(AR 000013.)

Assuming Flatt satisfied the definition of "disability" under the STD Plan, she would be entitled to receive seventy percent of her pre-disability earnings up to a maximum benefit of $1,080 per week.  The Plan further provided that "[b]enefits are payable for up to thirteen (13) weeks plus one additional week for every year of Active Employment, to a maximum duration of twenty-six (26) weeks."  (AR 000010.)  If Plaintiff was disabled under the STD Plan, she would be entitled to benefits for a period of twenty-six weeks.  On or about January 11, 2012, Flatt

initiated a claim for STD benefits pursuant to the terms of the Plan, claiming chest pain. (AR 000150.) Her last day of work was January 7, 2012. (AR 000149.)

Under the LTD Plan, an employee is considered disabled "on the first day that [she is] disabled as a direct result of a significant change in [her] physical or mental conditions," is "under the regular care of a physician" and is "disabled by the illness[ or] injury as determined by Aetna." (AR 000066.) The test for disability under the LTD Plan is as follows:

> From the date that [the participant] first became disabled and until monthly benefits are payable for 36 months [she] meet[s] the test of disability on any day that [she] cannot perform the material duties of [her] own occupation solely because of an illness[ or] injury . . . and [her] earnings are 80% or less of [her] adjusted predisability earnings.
>
> After the first 36 months of [her] disability that monthly benefits are payable, [she] meet[s] the plan's test of disability on any day [she is] unable to work at any reasonable occupation solely because of an illness[ or] injury . . .

(AR 000067.) Flatt became eligible for LTD benefits on July 23, 2012, following her maximum benefit period for STD benefits.

The Plan required the claimant to "give proof of the nature and extent of the loss" and to provide "copies of documents to support [her] claim" at Aetna's request. (AR 000079.) It also stated that "[b]enefits will be paid as soon as the necessary proof to support the claim is received." (AR 000080.) Eligibility for the LTD Plan terminated upon "[t]he date [the participant] is no longer under the regular care of a physician." (AR 000068.)

The records reflect a January 9, 2012, office visit to William Ryan Bartz, D.O., of Prime Care Selmer, who performed a follow-up examination of the Plaintiff after she was briefly hospitalized at Jackson-Madison County General Hospital ("JMCGH") in Jackson, Tennessee, the previous weekend for chest pains. (AR 000585.) He noted that she "has neuralgia[1] and

---

[1]Neuralgia is a "sharp, shocking pain that follows the path of a nerve and is due to irritation or damage to the nerve." http://www.nlm.nih.gov/medlineplus/ency/article/001407.htm.

panic disorder as well and elevated cholesterol with atypical chest pains for 2 weeks." (*Id.* (footnote added)) She reported chest pain/discomfort, fatigue and difficulty breathing when lying down. (*Id.*) Symptoms of difficulty breathing at night, near fainting, racing/skipping heartbeat, lightheadedness, shortness of breath with exertion, palpitations, muscle cramps with exertion, joint pain, joint swelling, presence of joint fluid, back pain, stiffness, muscle weakness, arthritis, gout, loss of strength, muscle aches or mental problems were denied. (AR 000585-86.) Nor was there deformity or scoliosis of the thoracic or lumbar spine. (AR 000587.) Physical examination revealed mild pain/distress and unkempt appearance, with depressed affect, anxiety and easy distraction. (*Id.*) She also had elevated blood pressure, with a sitting pressure of 155/88. (AR 000586.) When asked during the taking of her vital signs whether she was in pain, Flatt responded, "no." (AR 000587.) There is no evidence of tests conducted on that date and the doctor's notes did not contain a diagnosis of hypertension. Dr. Bartz issued a doctor's excuse for January 10 through 24, 2012, which contained the words "Limitations include:" followed by blank space. (AR 000584.)

She presented to Dr. Bartz again four days later, on January 13, 2012, complaining of weakness, malaise, near fainting, and chest pain/discomfort. (AR 000581.) Examination revealed mild pain/distress, unkempt appearance, depressed affect, anxiety and easy distraction. (AR 000582-83.) The notes again reflected under the heading "vital signs" that the claimant was asked if she was in pain and she answered in the negative. (AR 000582.) Her blood pressure had improved, dropping to 146/77. (*Id.*) The Plaintiff denied difficulty breathing at night and while lying down, fatigue, lightheadedness, shortness of breath with exertion, sleep disturbance or musculoskeletal difficulties, including muscle cramps, joint pain, back pain, muscle weakness, loss of strength or arthritis. (AR 000581-82.) The doctor's notes indicated that Flatt was taking

several medications, including Ambien, Fioricet, Xanax, Ibuprofen, Lidoderm, Fluoxetine, Pseudoephedrine, Hydrocodone-Acetaminophen and Lipitor. (AR 000580.) It is unclear from the record, however, whether Dr. Bartz prescribed these medications. He ordered an echocardiogram, which showed that all chambers of the heart were normal in size with good left ventricle systolic function, trivial mitral regurgitation, and no structural valvular abnormality. (AR 000579-80.) There is no indication that other tests were performed.

In an Attending Physician Statement bearing the same date, Dr. Bartz described Flatt's symptoms as chest pain and leg/waist pain and listed the objective findings substantiating her impairment as accelerated hypertension, tricuspid regurgitation and mitral regurgitation. (AR 000607.) He identified her primary diagnoses as accelerated hypertension, shingles and anxiety attacks. (AR 000605.) The physician opined that she had "[n]o ability to work" with "[s]evere limitation of functional capacity; incapable of minimal activity." (AR 000607.) He further indicated that she was not "[c]ompetent to endorse checks and direct the use of proceeds thereof," "[a]ble to work with others," "[a]ble to give supervision," or "[a]ble to work cooperatively with others in [a] group setting." (*Id.*)

Dr. Bartz referred the claimant to a cardiologist and an appointment was scheduled for January 16, 2012, at the Heart and Vascular Center of West Tennessee. The appointment was rescheduled for January 23, 2012, with a physician at The Jackson Clinic at Plaintiff's request because she wanted to see an in-network physician under her insurance plan. When Dr. Bartz's office notified her of the setting, she instructed that the appointment be cancelled, as she had gone to the emergency room and was informed "everything was normal." (AR 000578.) Flatt said she "[did not] want to go" to the cardiologist appointment and that she was seeing Dr. Bartz on January 19, 2012. (*Id.*)

During the January 19, 2012, office visit, Plaintiff complained to Dr. Bartz of weakness, sleep disorder, severe leg pain and post-shingles pain. (AR 000576.) Physical examination revealed moderate pain/distress, depressed affect, easy distraction and agitation. (AR 000576-77.) There is no indication that any tests were conducted. Dr. Bartz noted a past history of depression and chronic pain. (*Id.*) As was the case in previous visits, when asked during the taking of her vital signs whether she was in pain, Flatt reported that she was not. (AR 000576.)

Notes from Prime Care Selmer dated January 23, 2012, recorded a telephone call from claimant's daughter-in-law, identified as "Tiffany," expressing concern that Flatt had been suffering "major anxiety issues" again over the weekend, had been "ranting and raving" and was not "mak[ing] sense." (AR 000590.) Dr. Bartz referred Flatt to Linda Laney, a licensed professional counselor located in Jackson, for outpatient counseling. (AR 000589.) When his staff attempted to notify Plaintiff of the referral, her niece advised that the claimant had her own counselor and would see that person first. (*Id.*) There is no evidence in the record that Flatt actually saw her counselor, that the identity of the counselor was made known to Aetna, or that medical documentation concerning any office visits or testing by the counselor was submitted to the insurer.

Also on January 23, 2012, Dr. Bartz submitted to Aetna a Certification of Health Care Provider for Employee's Serious Health Condition form in which he reported that he had seen Plaintiff on three occasions, January 9, 13 and 19, 2012, and that she was unable to perform any of her job functions due to her conditions of atypical chest pain, anxiety/panic attacks and post-herpetic[2] neuralgia until cleared by a psychologist and disability physician. (AR 000162.) The

_____

[2]Post-herpetic neuralgia, a complication of shingles, affects nerve fibers and skin and causes burning pain that lingers for months or years after a shingles rash fades. http://www.mayoclinic.org/diseases-conditions/postherpetic-neuralgia/basics/definition/con-20023743.

physician noted that her condition would not require twice yearly treatment visits and that he referred her to a cardiologist, psychologist and a disability specialist. (*Id.*) He estimated the period of incapacity to run from January 9 through February 9, 2012, and advised that her condition would cause episodic flare-ups during which she would be "unable to fulfill work duties." (AR 000163.) Dr. Bartz completed an Attending Physician's Statement on the same date in which he indicated that Flatt's expected return to work date was "unknown until cleared by specialists." In the "Restrictions and Limitations" section of the form, he wrote "None." (AR 000539.)

Aetna advised Flatt in a letter dated January 25, 2012 that objective medical data must be submitted in support of her claim. (AR 000345.) She was instructed that these materials could include "[m]edical [e]xamination [f]indings[;] [t]est [r]esults[;] [x]-ray [r]esults[;] [o]ffice [n]otes [and] [o]bservation of anatomical, physiological or psychological abnormalities." (*Id.*)

Initially, Aetna found disability supported through February 8, 2012, with a projected return-to-work date of February 9, 2012. (AR 000350.) The claimant was notified of the approval by letter dated February 8, 2012. (AR 000351.) She was advised that, if an extension was needed, supporting evidence from her physician would be required. (*Id.*)

On February 7, 2012, internist John B. Woods, M.D. issued a letter to the Plaintiff thanking her for "allowing [him] to examine [her] last week for the purpose of evaluating [her] physical condition in the context of [her] disability claim." (AR 00500-01.) The letter further read as follows:

> You have longstanding complaints of severe arthritic pains involving your low back and both hips with radiation of pain into both legs. Your physical exam showed a very impaired antalgic gait pattern with limited abduction of both hips. Your lumbar spine flexion was reduced to about 70 degrees, and you had pain in your low back with dorsiflexion and plantar flexion of both feet. Bilateral hip abduction was reduced to 30 degrees, and extension was quite limited at fifteen

degrees. I also noted symmetrically decreased grip strength bilaterally. I noted no other pertinent physical findings.

You certainly appeared uncomfortable during the course of our encounter, and your affect was markedly flat, consistent with your complaints of longstanding pain. You were cooperative, and I detected no evidence of malingering. Unfortunately, I was unable to review any results of imaging studies of your back or hips, though we did request and receive records from Dr. Bartz.

It is my opinion based on examining you that you are unable to maintain gainful employment. My opinion is based primarily on your low back and hip pain, along with your limited lumbar and hip ranges of motion. Your diminished grip strength also limits your ability to work. If you have had imaging studies of your lumbar spine and hips, I suggest you make sure they are available for review by the state as part of your disability claim.

I also suspect you have a substantial psychological component contributing to your impairment, but I do not have the expertise to speak authoritatively about that aspect of your condition. I do suggest a psychological evaluation with attention to your history of closed head injury after a motor vehicle accident in the 1980s, as well as exploring the possibility of post-traumatic stress disorder related to the loss of your son in 1995.

(*Id.*) The record contains no office notes from Dr. Woods. Also, while he mentioned the lack of results of any imaging tests, he apparently made no effort to conduct any tests of his own.

Flatt appeared at Dr. Bartz's office again on February 14, 2012, for a follow-up relating to anxiety, in which she complained of muscle cramps, joint pain, loss of strength, anxiety and depression. (AR 000563.) He noted that she had "forms to be filled out for [Family Medical Leave Act] extension" and had "been talking to [a] counselor as directed by [her primary care physician]." (*Id.*) Physical examination again reflected "moderate pain/distress" and anxiety. (*Id.*) Under the "vital signs" heading, she again responded in the negative when asked if she was in pain. (*Id.*) There is no indication that testing was performed. The record reflects no office visits to Dr. Bartz after February 14, 2012.

Shortly thereafter, Aetna received a request for an extension of the benefits period from Dr. Bartz and an estimated return to work date of March 9, 2012. (AR 000206.) The doctor

cited back, hip and foot pain as the reasons for the request. (*Id.*) Claim notes stated that "[Flatt] has job requiring mental clarity and some phys[ical] demands such as moderate lifting. [Plaintiff] has multiple complaints, long standing issue of back pain combined with current exacerbation of mental nervous complaints, and it is reasonable that due to the comb[ination] of these issues, [Flatt] would be unable/unsafe to perform her duties [through March 8, 2012]." (AR 000224.) Aetna approved an extension of STD benefits through March 8, 2012, with a projected return to work date of March 9, 2012, (AR 000354) and so advised Flatt in a letter dated February 23, 2012 (AR 000355). She was further instructed therein that, in the event she wished to seek recertification beyond March 8, 2012, she was to take the letter to her physicians' offices and request additional information, including chart notes, test and examination results, treatment plans, and documentation regarding therapy, if any. (*Id.*)

On or about February 29, 2012, Plaintiff submitted what appears to be a handwritten appeal letter in which she reported severe pain on walking, back pain while sitting, difficulties in wearing clothing due to irritation and pain, as well as pain in her hip and leg. (AR 000779.) She also related that her nerves were "shot" and that she was grieving her son who had died some seventeen years previously in a car accident that occurred shortly after her father's death. (AR 000779-80.) Her brother was also deceased. (*Id.*) Flatt listed Drs. Bartz and Woods as her physicians, and advised that she was seeing Michael Bearb, M.D. at JMCGH for pain management. (*Id.*) She informed Aetna that she would not be returning to work on March 9, 2012. (AR 000227.)

In a letter dated April 20, 2012, the insurer acknowledged receipt of Flatt's request for an appeal and again instructed her to follow up with her health care providers to have any documentation regarding office visits, diagnostic testing, therapy notes and other materials

forwarded to Aetna for review. (AR 000358.) According to its records, Aetna was advised by Flatt in a telephone conference on May 22, 2012, that she had been seeing Dr. Bearb since March 2012. (AR 000237.) At that time, Plaintiff was informed that Dr. Bearb's records needed to be provided to Aetna. (*Id.*) That same day, Aetna contacted JMCGH to confirm that documentation from Dr. Bearb could be provided for its review. (AR 000234.) The claims representative was advised that a medical release and request must be sent to the hospital's medical release of information department. (*Id.*) Aetna's internal notes reflect that Flatt was notified thereof and its claims representative relayed to the her that, as a courtesy, a medical information request and an Aetna authorized release form would be sent to the provider. (AR 000237.) The record includes letters from Aetna to JMCGH dated May 22 and June 13, 2012, requesting documentation relative to Dr. Bearb's treatment of the Plaintiff and providing authorization forms. (AR 000360-61.) Internal notes indicate that, in June 2012, the claimant was informed that a request letter and the appropriate forms had been mailed to JMCGH. (AR 000243.) According to the record, Flatt related to Aetna in a telephone conversation that she contacted JMCGH herself and was told that the hospital required prepayment for medical records. (AR 000245.) The Aetna representative informed her that it did not pay for records for self-insured accounts. (*Id.*) There is no indication JMCGH provided Dr. Bearb's records to Aetna. Nor is there any evidence or claim that Plaintiff made an effort to obtain the hospital records herself and submit them to the insurer. Indeed, the record contains no medical documentation of any kind from March to August 2012.

In an Aetna physician peer review in the specialty of pain management conducted in July 2012 in connection with the STD appeal, Dr. Stuart Rubin, board certified in physical medicine and rehabilitation, opined after reviewing the records of Dr. Bartz, Dr. Woods' February 7, 2012,

letter, and the Plaintiff's February 29, 2012, communication that "functional impairments from a musculoskeletal point of view are not supported from [March 9, 2012,] through [June 29, 2012]." (AR 000514.)  Dr. Rubin stated in his report that he attempted to contact Drs. Bartz and Bearb, but his telephone calls were apparently not returned.  (AR 000513.)

In July 2012, internal Aetna claim notes reflect that "[r]eview of account indicates that there is no valid plan on file for STD."  (AR 000248.)  The termination of benefits was overturned and the claim reopened.  (AR 000248, 000250.)  A notation by Matthew T. McCalley, Aetna STD team leader, contained in the insurer's claim file and dated August 17, 2012, stated that "[t]he reason [that the] appeal unit overturned the denial is because they could not find the contract on file with plan language."  (AR 000273.)  McCalley went on to comment, however, that "[c]linically the claim is unsupported[, as] documented in the peer review.  We need to deny the extension beyond [July 13, 2012]."  (*Id.*)  Aetna informed the employee that the claim had been reopened by letter dated July 13, 2012.  (AR 000364.)

Aetna issued another letter to Flatt on July 20, 2012, advising that "based on the contractual guidelines and current medical information on file," her STD claim approval was extended through July 13, 2012, with a projected return to work date of July 14, 2012.  (AR 000369, AR 000368.)  The insurer indicated in file notes that it was "[r]easonable to support claim for this period due to diagnosis and job physical demand level of [m]edium."  (AR 000263.)  Plaintiff was admonished in the July 20, 2012, letter that benefits would not be extended beyond July 13, 2012, "unless we receive and review additional medical information that supports your entitlement to continued benefits" and that such information "must provide [Aetna] with a clear understanding of how your disability continues to prevent your return to work."  (AR 000369.)  The claimant was informed that it was her "responsibility to provide

additional updated medical information to support an absence if [she] remain[ed] absent from work." (*Id.*)

Flatt was granted monthly disability benefits from the Social Security Administration ("SSA") beginning in July 2012. (AR 000506.) The agency's determination, dated May 15, 2012, stated:

> You said you became unable to work on [January 1, 1978,] because of arthritis in legs and hips, shingles on back, chronic pain, blood pressure, anxiety, stress, depression, and cataracts.
>
> The records show that your condition was not severe enough to keep you from working as far back as [January 1, 1978]. After careful consideration of all the evidence, we conclude that you became disabled as of [January 7, 2012]. This is the earliest date the records show your condition was severe enough to keep you from working.

(AR 000509.) The SSA's Explanation of Determination noted that reports from the following sources were used to decide Flatt's claim: Fred's Pharmacy dated January 15, 2011, to March 9, 2012; Dr. Woods dated February 7, 2012; McNairy Regional Hospital from April 29, 2004, to October 5, 2005; The Jackson Clinic North from March 5, 1998, to April 20, 2011; Dr. Bruce E. Herron dated February 26, 1996, to November 24, 2008; Prime Care Medical Center P.C. from December 5, 2008, to January 23, 2012, and JMCGH from December 14, 2009, to January 16, 2012. The SSA also listed a JM Associates psychologist consultative examination dated April 26, 2014, and Wellcare Inc. ASE consultative examinations dated April 7, 2012. It is undisputed that, although Flatt provided Aetna with an executed SSA consent authorization for release of information form at the insurer's request, it never collected or reviewed any documentation from the SSA. (*See* D.E. 42 at 18.)

In a letter to Plaintiff dated August 23, 2012, Aetna reiterated that her STD claim was denied beyond July 13, 2012, explaining that

> [t]he information received does not provide us with a clear understanding of how your disability prevents your return to work. We understand that you feel the symptoms you experience have prevented you from working. However, we must rely on the written medical evidence to document functional impairment, and such medical evidence must support a level of impairment that would normally preclude someone from performing his or her regular job duties. The medical information reviewed lacks sufficient objective clinical findings to support an extension of your claim.

(AR 000371.) The claimant was again advised to take the letter to her physicians' offices and request information, including an estimated return to work date, chart notes, test/examination results, treatment plans and therapy documentation, if any. (*Id.*) This information, Aetna instructed, "must provide [it] with a clear understanding of how [her] disability continues to prevent [her] return to work." (*Id.*) The July 13, 2012, termination of STD benefits occurred nine days short of the maximum duration of benefits under the STD Plan.

Plaintiff applied for LTD benefits on or about July 25, 2012, indicating that she had been unable to work since January 9, 2012, due to hypertension, shingles, anxiety, panic attacks and sleep disorder. (*See* AR 000518.) Aetna provided her with an STD to LTD kit and opened an LTD claim. (AR 000615.) In a letter dated August 14, 2012, the insurer informed Flatt that the claim had been denied, stating that "[b]ased on the information provided we do not have sufficient medical information supporting disability to be considered eligible for long-term disability benefits and you are not totally disabled from performing the duties of your own occupation and you are not under the care of a disab[ility] provider." (AR 000517-18.) Aetna identified the medical information reviewed as Dr. Bartz's January 23, 2012, Attending Physician Statement and the peer review conducted by Dr. Rubin.[3] (*Id.*) The correspondence further pointed to a telephone conversation with the claimant on July 30, 2012, in which she

---

[3]The letter also referenced a medical document review by a Dr. Rubin Swotinsky, who concluded Flatt would be able to perform her occupation as a non-certified technician. (AR 000518.) The administrative record, however, contains no report prepared by a physician with that name.

"confirmed the only treating provider is Dr. Bartz and [she had] not seen this provider in several months as [she had] no medical insurance and [could not] afford to treat with a provider." (AR 000518.) She was advised that Aetna would review additional information she cared to submit including

> a detailed narrative report for the period [March 9, 2012,] through current from all treating providers specific [sic] physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned; physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed; diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings; any information specific to the condition(s) for which you are claiming total disability that would help us evaluate your disability status; and any other information or documentation you think may help in reviewing your claim[;] current and specific observed examination findings which document the presence of severe cognitive, emotional, and behavioral impairments impeding your work functionality, observable deficits with symptoms such as hopelessness, helplessness, inappropriate appearance and hygiene, difficulty with self-composure, irritability, psychomotor agitation/retardation, sleep issues, appetite/weight difficulties impeding ability to function[; and] [u]pdated [a]ttending physician statement from a disa[bility] provider.

(*Id.*) Plaintiff's appeal of the decision was received by Aetna on August 27, 2012. (*See* AR 000723, 000730.)

The insurer requested updated information from Dr. Bartz, who responded only by stating that he was no longer handling Plaintiff's disability claims. (AR 000809.) Flatt provided documentation with respect to her February 14, 2012, office visit and an August 2, 2012, injection of Depo/Decadron at Prime Care Selmer. (AR 000289.) Aetna's internal notes indicated that the office visit had been previously reviewed and determined not supportive of disability and that the injection, unaccompanied by evidence of physical examination, tests or treatment plans, was not by itself disabling. (*Id.*) She also submitted for review a letter from Dr. Woods dated August 28, 2012, which was nearly identical to his communication of the previous February. It stated as follows:

Thank you for allowing me to examine you today for the purpose of evaluating your physical condition in the context of your disability claim. This letter shall serve to document the results of my evaluation.

You have longstanding complaints of severe arthritic pains involving your shoulders and low back and both hips with radiation of pain into both arms and legs. You have persistent left thoracic back pain following an episode of shingles in 2007. Your physical exam showed a very impaired antalgic gait pattern with limited abduction of both hips. Your lumbar spine flexion was reduced to about 70 degrees, and you had pain in your low back with dorsiflexion and plantar flexion of both feet. Bilateral hip abduction was reduced to 30 degrees, and extension was quite limited at fifteen degrees. I also noted symmetrically decreased grip strength bilaterally. I noted no other pertinent physical findings.

I note your symptoms of left thoracic back pain are consistent with your history of shingles in 2007.

You certainly appeared uncomfortable during the course of our encounter, and your affect was markedly flat, consistent with your complaints of longstanding pain. You were cooperative, and I detected no evidence of malingering.

It is my opinion based on examining you that you are permanently unable to maintain gainful employment. My opinion is based primarily on your thoracic and lumbar back and hip pain, along with your limited shoulder and lumbar and hip ranges of motion. Your diminished grip strength also limits your ability to work.

I also suspect you have a substantial psychological component contributing to your impairment, but I do not have the expertise to speak authoritatively about that aspect of your condition. I do suggest a psychological evaluation with attention to your history of closed head injury after a motor vehicle accident in the 1980s, as well as exploring the possibility of post-traumatic stress disorder related to the loss of your son in 1995.

(AR 000524-25.) An Aetna Attending Physician's Statement bearing Dr. Woods' signature and dated August 28, 2012, reflected diagnoses of severe arthritis pain in hips and legs, shingles pain, "nerves," and migraine headaches and stated that she would not be able to return to work. (AR 000526-27.) However, it appears the form was completed not by the physician but by the Plaintiff herself. A comments section of the document contained the following handwritten

statement: "*my* pain wakes *me* up early" and, under the category of "symptoms" is written "nervous ever since *I* could not work." (AR 000527 (emphasis added).)

In a Capabilities and Limitations Worksheet dated August 28, 2012, and bearing Dr. Bearb's signature, it was noted that Flatt suffered from severe arthritis in the legs, shoulders and hands; back pain due to shingles; migraine headaches, hip pain and "nerves." (AR 000538.) Again, it appears the form was filled out by the claimant, as it contained statements such as "hard on *me*" next to a question about "firm hand grasping" and, in a section entitled "Additional Comments," "*I* hurt to [sic] much *I* try *my* best not to make pain worse." (*Id.* (emphasis added)) In its internal chronological reports, Aetna noted that some of the "doctor's" statements appeared to have been completed by the Plaintiff.

In an Aetna physician review completed on or about October 10, 2012, Dr. Leonard Schnur, a board certified psychologist, observed that

> Dr. Woods . . . noted his opinion that the claimant had a psychological component of impairment including [Post-Traumatic Stress Disorder] over the loss of a child and a closed head injury related to a motor vehicle accident. There were, however, no formal measurements of cognitive or emotional functioning to substantiate an impairment of a psychological nature. Dr. Woods suggested a psychological evaluation for follow up on this issue.

(AR 000474.) He opined as follows:

> Based upon the documentation submitted for review, there was a lack of examination findings to substantiate a functional impairment across cognitive, emotional, and behavioral spheres which would have precluded the claimant from performing the work of her own occupation for the time period [July 14, 2012,] through [July 22, 2012]. The limited documentation submitted for review primarily addressed the claimant's physical complaints and, although noting the presence of some degree of emotional distress marked by symptoms of anxiety and panic disorder, did not include any formal measurements of cognitive or emotional functioning to substantiate a functional impairment.

\*        \*        \*

> From a psychological standpoint, as a functional impairment was not substantiated, no restrictions or limitations would have been needed.

(AR 000475.)  Dr. Schnur did not conduct a peer-to-peer consultation with any of Flatt's treating physicians or perform an in-person evaluation of her condition.  (*See* D.E. 42 at 14.)

A physician review in the specialty of physical medicine and rehabilitation/pain management was completed by Dr. Andrea Wagner, board certified in physical medicine and rehabilitation and a clinical assistant professor in the Department of Rehabilitation Medicine at Tufts University School of Medicine, on or about October 19, 2012, in relation to Plaintiff's appeals.  (AR 000311.)  She arrived at the following conclusion:

> Concerning impairment from [July 14, 2012,] to [July 22, 2012], there is insufficient medical evidence of functional impairment to support functional impairment.  The medical information contained is incomplete and vague.  There was not detailed examination nor any evidence of a focal deficit during the period in question.  The evidence does not support a functional impairment that would be of great consequence.

> The record indicates that Dr. Woods noted decreased flexion, hip abduction and grip strength; however, his examination was insufficiently detailed.  He also notes a psychiatric component.  It is therefore unclear whether these findings are organic in nature.

> *            *            *

> The restrictions of total disability appear to be excessive as there is very little evidence of impairment and the issue of a possible inorganic component.  Ms. Flatt's self-reported complaints are not supported by the evidence of impairment or focal deficit.

(AR 000311, 000469.)  Dr. Wagner's report reflected that she made two unsuccessful attempts, on October 15 and 18, 2012, to contact Dr. Bearb for a peer-to-peer consultation and, consequently, completed the report without his input.  (AR 000468.)  She did not examine the claimant.  (*See* D.E. 42 at 16.)

A peer review was also completed on or about October 22, 2012, by Dr. Malcolm McPhee, board certified in physical medicine and rehabilitation. He noted that the records of Drs. Bartz and Bearb contained in the file revealed no clinical, imaging or laboratory findings. (AR 000752-54.) He also observed that "[w]hen the claimant was evaluated for Social Security Disability, the letter of approval noted that her back condition was not severe enough to keep her from working although an award was made possibly based on psychiatric conditions." (AR 000752.)

Dr. McPhee's opinion was as follows:

Based on the provided documentation, and telephonic consultation there were no clinical findings, imaging studies or other studies to support physical functional impairments from [January 9, 2012,] through [October 24, 2012].

The restrictions and limitations apparently written on a form by the claimant indicated she can only work 2 hours per day and signed on [August 28, 2012,] by Dr. Bearb are not supported by the medical information.

Based on the provided documentation, and telephonic consultation there were no physical or cognitive examination findings of any functional impairment suggesting that the claimant's ability to work has been directly impacted by an adverse medication effect during the time period from [January 9, 2012,] through [October 24, 2012].

(AR 000753.) While Dr. McPhee did not confer directly with Drs. Bearb and Woods, he contacted their offices and spoke to, questioned and obtained information concerning the claim from members of the physicians' staffs. He reported thusly on the results of those conversations:

On [October 22, 2012], a call was made to the office of Michael Bearb, MD, anesthesiology, at 11:58 AM MST and I spoke to Dr. Bearb's medical assistant who advised me that Dr. Bearb was at the hospital and the medical assistant asked if he could help me. I explained why I was calling and asked if [he] could look at the form dated [August 28, 2012,] which was signed by Dr. Bearb but that was written in the first person singular. He agreed and looked in their file notes that indic[a]ted Dr. Bearb stated he signed a form for the claimant and hoped it would help the claimant get her insurance back. I asked about the listing of severe arthritis pain and if their records showed any x-rays, laboratory studies or any clinical findings to support a diagnosis of arthritis. The medical assistant stated

there were no imaging studies or laboratory studies. I asked if Dr. Bearb had provided injections and he indicated that nine injections had been provided which appeared to be soft tissue injections.

On [October 22, 2012], at 12:15 PM MST, a call was made to the office of Dr. John Woods, MD. He was not in the office and I spoke to Julie and explained why I was calling. I asked if there were any imaging studies or clinical examinations showing findings for a diagnosis of arthritis. Julie reviewed their records finding that the claimant was given an appointment for [January 31, 2012,] at an attorney's request but there was no record of an examination and the claimant was also a no show for another appointment on [August 28, 2012].

(AR 000752-53.) There is no indication he attempted to contact Dr. Bartz. Nor did he perform an in-person evaluation of the Plaintiff. (*See* D.E. 42 at 15.)

Aetna issued a letter to Flatt on November 12, 2012, notifying her that its original decision to terminate her STD benefits had been upheld on the grounds that there was insufficient medical evidence to support her inability to perform the duties of her occupation as of July 14, 2012. (AR 000383-84.) In this correspondence, Aetna related that it had reviewed records from Drs. Bartz and Woods, forms signed by Dr. Bearb, the SSA award, and the physician review reports. (*Id.*) The insurer advised that

> [b]ased upon our review of the information you provided, . . . we have determined that there was insufficient medical evidence to support your inability to perform the material duties of your own occupation, as of July 14, 2012. There was no documentation of imaging studies or diagnostics that would support a specific functional impairment. Therefore, the original decision to terminate STD benefits, effective July 14, 2012, has been upheld.

(*Id.*) Aetna acknowledged the SSA's award of benefits and explained:

> We received notification that you were awarded Social Security Disability Income (SSDI) as of January 7, 2012. We were not provided any indication of the documentation or information that the Social Security Administration used in making their decision. However, we are aware that they have their own guidelines in making their decision, such as age or diagnosis. Since we do not know how they arrived at their decision, we cannot definitively say why our decision is different, except that Aetna relied solely on the information provided for us for review, and the definition of disability as defined by your employer's group plan.

(AR 000383.)

Plaintiff was informed in a second November 12, 2012, letter that her LTD appeal had

been denied.  (AR 000732.)  Defendant articulated that

> [o]ur review has been unable to find medical evidence, imaging studies, or
> diagnostic testing, that would substantiate a specific physical deficit that would
> prevent you from performing the material duties of your own occupation as of
> January 9, 2012.  Based upon our review of the information you provided, . . . we
> have determined that there was insufficient medical evidence to support your
> inability to perform the material duties of your own occupation, as of January 9,
> 2012.  Therefore, the original decision to deny your LTD benefits, effective July
> 23, 2012, has been upheld.

(AR 000733.)  With respect to mental issues, the Defendant articulated that

> [t]he documentation we have on file includes several notes suggesting the
> presence of some degree of emotional distress marked by symptoms of anxiety
> and panic.  We [] read in your appeal letter your grief over the loss of your son
> and two family members.  However, there is no documentation that you sought
> treatment from a mental health professional.  There is no indication of formal
> measurements of your cognitive or emotional functioning to substantiate
> impairment in your psychological functioning.

(AR 000732.)

*ANALYSIS*

The Statute.

"ERISA is a comprehensive statute designed to promote the interests of employees and

their beneficiaries in employee benefit plans."  *Stiso v. Int'l Steel Group*, 604 F. App'x 494, 497

(6th Cir. 2015) (quoting *Shaw v. Delta Air. Lines, Inc.*, 463 U.S. 85, 90 (1983)).  This "regulation

of employee welfare and pension benefit plans provides administrative oversight, imposes

criminal sanctions, and establishes a comprehensive civil enforcement scheme."  *Girl Scouts of*

*Middle Tenn., Inc. v. Girl Scouts of the U.S.A.*, 770 F.3d 414, 418 (6th Cir. 2014) (quoting *N.Y.*

*State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 650-51

(1995)) (internal quotation marks omitted).  The statute permits a plan participant "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

ERISA plans "are products of their drafting" and their requirements bind those who participate therein.  *Jensen v. Aetna Life Ins. Co.*, 32 F. Supp. 3d 894, 899 (W.D. Tenn. 2014).  Likewise, courts are bound by the specifications of the plan at issue.  *Id.*

Standard of Review.

"Because the role of a district court in ERISA matters is not to determine whether issues of fact exist for trial, but to review the administrative record before it, district courts should more properly characterize their role in such proceedings as encompassing elements of both bench trials and summary judgments."  *Id.* at 898 (citing *Gibson v. Prudential Ins. Co. of Am.*, 513 F. Supp. 2d 950, 956 (E.D. Tenn. 2007)).  In an action challenging a denial of benefits under ERISA, a plan administrator's decision is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary "discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Waskiewicz v. UniCare Life & Health Ins. Co.*, ___ F.3d ___, 2015 WL 5751585, at *3 (6th Cir. Oct. 2, 2015).  "When applying a *de novo* standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision."  *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002) (alterations & internal quotation marks omitted).  The administrator's conclusion enjoys no deference or presumption of correctness.  *McKenna v. Aetna Life Ins. Co.*, ___ F. App'x ___, 2015 WL 4880042, at *5 (6th Cir. Aug. 14, 2015).

However, "[w]here the plan administrator is vested with discretion to determine eligibility for benefits, the plan administrator's denial of benefits will be overturned only if it is arbitrary and capricious." *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 605 (6th Cir. 2014). "Although 'magic words' are not required, [the Sixth Circuit] has consistently required that a plan contain a *clear* grant of discretion to the administrator or fiduciary before applying the deferential arbitrary and capricious standard." *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 566 (6th Cir. 2013) (some internal quotation marks omitted).

This standard is "extremely deferential" and the "least demanding form of judicial review of administrative action." *Brown v. Fed. Exp. Corp.*, 610 F. App'x 498, 503 (6th Cir. 2015); *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014). "An 'extremely deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision." *McClain*, 740 F.3d at 1064. "The arbitrary and capricious standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was 'rational.'" *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (quoting *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). Thus, a decision reviewed according to this standard must be upheld if it results from a "deliberate, principled reasoning process" and is "supported by substantial evidence." *Id.* (quoting *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009)).

While "the arbitrary and capricious standard of review is highly deferential, federal courts are not mere 'rubber stamps.'" *Hayden*, 763 F.3d at 605. The standard "entails review of

the quality and quantity of the evidence," *id.*, and "calls for a totality of the circumstances type of analysis of the decision to deny benefits," *Wooden v. Alcoa, Inc.*, 511 F. App'x 477, 482 (6th Cir. 2013). "The ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 660 (6th Cir. 2013) (quoting *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002)); *see also Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 981 (6th Cir, 2010) ("The ultimate question in any given disability case on 'arbitrary and capricious' review is whether a plan can offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not 'disabled' within the plan's terms."). The claimant bears the burden of proving that the administrator's decision was arbitrary and capricious. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011).

The parties agree that the arbitrary and capricious standard applies to the Court's review of the denial of STD benefits. Indeed, the STD Plan provided that "[t]he Plan Administrator will have, at its discretion, exclusive authority and responsibility for all matters in connection with the operation and administration of the Plan[, including] determin[ing] eligibility for benefits under the Plan" and interpreting the plan. (AR 000018.) The plan administrator may also "delegate any of the rights, powers, and duties . . . with respect to the operation and administration of the Plan to one or more committees, individuals or entities." (*Id.*)

The Defendants submit that the arbitrary and capricious standard also applies to its decision on the LTD claim for benefits. However, the Plaintiff asserts that the LTD Plan did not grant discretionary authority to the administrator and, thus, the *de novo* standard should govern.

Benefits under the LTD Plan are funded under a Group Life and Accident and Health Insurance Policy, numbered GP-473344, issued by Aetna to Fred's. (AR 000039-59.) The policy provided in part that the insurer has "discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the [Booklet-]Certificate or any other document incorporated herein" (AR 000057); that the "entire Policy consists of," among other things, "[t]he attached [Booklet-]Certificate[]" and that "[t]his Policy consists of all provisions set forth in [the policy] as well as the provisions found in the [Booklet-]Certificate" (AR 000044, AR 000056). The booklet-certificate was, according to its preface, "part of the *Group Insurance Policy* between Aetna Life Insurance Company and the Policyholder [Fred's]." (AR 000062.) The preface advised that "[t]he *Group Insurance Policy* determines the terms and conditions of coverage." (*Id.*) The booklet-certificate was the summary plan description for the LTD Plan required by ERISA. (AR 000087.)

Although Flatt's argument on this issue is scant to say the least,[4] it appears to be her position that, because discretionary authority was not separately granted in the booklet-certificate, the *de novo* standard must be applied. She cites to no case law supporting the view that silence in the booklet-certificate trumps a clear grant of discretionary authority contained in the policy.[5]

---

[4]Her discussion of this point consists of one sentence: "Fred's Inc. Welfare Plan does not grant the Plan Administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the Plan." (D.E. 37-1 at 3.) Moreover, Flatt's short assertion appears to be a half-hearted one, as, in the remainder of the brief setting forth her specific challenges to Aetna's determinations, she argues exclusively that denial of her claims for benefits, whether for STD or LTD, was arbitrary and capricious.

[5]There is no requirement that the terms of an ERISA plan be contained in a single document. *Maynard v. Prudential Ins. Co. of Am.,* No. 1:12 CV 3085, 2013 WL 5964461, at *7

A decision outside this Circuit, *Jabara v. Aetna Life Insurance Co.*, No. 3:13-CV-02041, 2014 WL 6769971 (M.D. Pa. Dec. 1, 2014), is instructive.  In *Jabara,* the district court held that language similar to that contained in the Aetna policy and booklet-certificate in this case was sufficient to grant Aetna clear discretionary authority to determine eligibility for benefits, construe the terms of the plan, and trigger application of the arbitrary and capricious standard.  *Jabara*, 2014 WL 6769971, at *2-3.  As has the claimant in this case, Jabara argued that, where the group policy granted discretionary authority but the booklet-certificate was silent, authority had not been conveyed.  *Id.* at *5.  The court rejected that assertion, stating that "[t]he fact that the Booklet-Certificate does not repeat the grant of discretionary authority contained in the Group Insurance Policy does not create a conflict [between the two documents].  Because no conflict exists, the language of the Group Insurance Policy governs, and arbitrary and capricious review applies."  *Id.* (internal citation omitted).  Based on the clear grant of discretionary authority to the plan administrator contained in the group policy in this case, the Court will apply the deferential arbitrary and capricious standard to the denial of LTD benefits.

<u>Plaintiff's Challenges to the Administrator's Determinations and Application of the Arbitrary and Capricious Standard.</u>

It is Defendants' position that Aetna's denial of Plaintiff's disability claims beyond March 2012, due to lack of clinical medical support was not arbitrary and capricious.[6]  In order to determine whether its ultimate decision to deny benefits was arbitrary and capricious, the Court

---

(N.D. Ohio Nov. 7, 2013) (quoting *Rinard v. Eastern Co.,* 978 F.2d 265, 268 n.2 (6th Cir. 1992)).

[6]Although the Defendants present argument concerning Aetna's structural conflict of interest and its effect on the arbitrary and capricious analysis, the Court will not address it, as the Plaintiff has not asserted in her briefs that such a conflict of interest was in any way responsible for the denial of benefits.

must examine Aetna's determination in light of the administrative record.  *See Judge*, 710 F.3d at 660.

Throughout the claims process, the Plaintiff was informed that it was her responsibility to ensure Aetna received medical information supporting her claim.  She was advised more than once that written medical evidence exhibiting objective clinical findings and documenting a functional impairment was required sufficient to provide Aetna with a clear understanding of how her disability continued to prevent her from working.  In this Circuit, "requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable, even when such a requirement does not appear among the plan terms."  *Hunt v. Metro. Life Ins. Co.*, 587 F. App'x 860, 862 (6th Cir. 2014) (citing *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007)) (internal quotation marks omitted); *see also Judge*, 710 F.3d at 660.  Flatt argues that Aetna improperly discounted the evidence submitted on her behalf in favor of "cursory" determinations by peer reviewers.

While the STD Plan reserved the right to conduct a physical examination, nothing therein required that Aetna do so; nor did the Plans prohibit a file review by a consulting physician in place of a physical evaluation.  The Sixth Circuit has noted that "a plan administrator's failure to conduct a physical examination may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."  *Cooper*, 486 F.3d at 167 (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)) (internal quotation marks omitted).  One such case is "where the right to conduct a physical examination is specifically reserved in the plan."  *Judge*, 710 F.3d at 663 (citing *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006)).  However, "reliance on a file review does not, standing alone, require the conclusion that a plan administrator acted improperly."  *Brown*, 610 F. App'x at 505 (quoting *Calvert*, 409 F.3d at

295). Moreover, as previously noted, the Plan at issue here tasked the Plaintiff with proving her disability. *See Hammonds v. Aetna Life Ins. Co.*, No. 2:13-cv-310, 2015 WL 1299515, at *15 (S.D. Ohio Mar. 23, 2015) (in finding administrator's failure to conduct a physical examination was not arbitrary and capricious, court noted that the plan placed the burden of furnishing proof of disability on the participant).

"[U]nder ERISA, plan administrators are not required to accord special deference to the opinions of treating physicians." *Hunt*, 587 F. App'x at 862 (quoting *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010)). "Reliance on other physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions." *Id.* (citing *Balmert*, 601 F.3d at 504). Plan administrators are not compelled to credit opinions of treating physicians "over other evidence relevant to the claimant's medical condition." *Curry v. Eaton Corp.*, 400 F. App'x 51, 59 (6th Cir. 2010) (per curiam). "[A] lack of objective medical evidence upon which to base a treating physician's opinion has been held sufficient reason for an administrator's choice not to credit that opinion." *Id.*; *Morris*, 399 F. App'x at 987. The administrator "can resolve conflicts between [the opinions of treating physicians] and the opinions of its own file reviewers if it provides reasons -- including a lack of objective evidence -- for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review of [the claim.]" *Curry*, 400 F. App'x at 60. An insurer's reliance on a file review is "just one more factor to consider in [the court's] overall assessment of whether [it] acted in an arbitrary and capricious fashion." *Cooper*, 486 F.3d at 167 (quoting *Calvert*, 409 F.3d at 295).

In this case, the Plaintiff has failed to carry her burden of showing that the plan administrator acted arbitrarily and capriciously. There was no evidence whatsoever supporting a psychological deficit beyond suggestions that Flatt see a mental professional, advice it is

unknown from the record whether she followed. *See Hogan*, 521 F. App'x at 416 (plan administrator's rejection of claimant's request for benefits not arbitrary and capricious where treating physician, an internist lacking any mental health specialization who diagnosed depression with anxiety and referred her to a psychiatrist, submitted no clinical verification of her condition). While there seemed to be some speculation on the part of her doctors and the reviewing physicians that her physical complaints might have at least to some extent had psychological origins, without any evidence supporting such a conclusion it was not arbitrary and capricious for Aetna not to award benefits on that basis.

With respect to her physical complaints alone, despite her insistence in her handwritten letter to Aetna that she was in severe pain, her pain was never described in Dr. Bartz's notes as more than "mild" or "moderate." On more than one occasion he noted "mild" pain when the claimant reported during the taking of her vital signs to be in no pain at all. In any case, "[s]ubjective complaints of [pain] by themselves do not compel an administrator to grant disability benefits." *Combs v. Reliance Standard Life Ins. Co.*, 511 F. App'x 468, 471 (6th Cir. 2013) (per curiam); *see also Frazier*, 725 F.3d at 570 ("It was not arbitrary and capricious for [plan administrator] to review the full record and make a considered determination rather than simply relying on [participant's] stated pain levels."). None of her physicians performed any testing, imaging or laboratory testing, other than the echocardiogram ordered by Dr. Bartz which revealed only trivial abnormalities, that would support their conclusions she was unable to work. It appears from the reports that the peer physicians reviewed the records provided to Aetna and found, based on those reviews, that the medical evidence did not support continued disability. The Court does not find, based on the arbitrary and capricious standard, that Aetna's file reviews were unsubstantiated or cursory in their analysis of the record. In addition, the claimant was

clearly made aware on numerous occasions of the type of medical evidence required by Aetna to support her claims, but she apparently made no effort to procure it. *See Judge*, 710 F.3d at 661 ("MetLife's initial denial letter concluded that the record lacked 'objective medical documentation' [to support Judge's claim]. Judge was therefore on notice as to the information that he was required to produce in order for his claim to be approved on administrative appeal. He nevertheless chose not to ask [his treating physicians] to submit updated medical evidence, despite the Plan placing the burden on Judge to establish his disability . . ."]. Aetna's suspicions concerning Flatt's updated submissions of medical evidence, including the claimant-completed forms and her apparent failure to appear for examination by Dr. Woods in connection with his August 28, 2012 letter, were rational. Finally, it was also reasonable for the insurer to find that mere information of an injection, absent any chart notes or other data, was insufficient to support an award of benefits. For these reasons, the Court finds Aetna's denial of benefits was not arbitrary and capricious.

Because the denial of STD benefits was not arbitrary and capricious, neither was the denial of LTD benefits, as Flatt's claim therefor suffered from the same deficiencies. In addition, Flatt's statement to Aetna in July 2012 that she had only one treating physician -- Dr. Bartz -- and that she had not been treated by him for several months provided substantial support to the insurer's denial of benefits under the LTD Plan, which required her to be under the regular care of a physician.

Plaintiff's other challenges to the plan administrator's decision do not convince the Court otherwise. Flatt complains that none of Aetna's reviewers conducted peer-to-peer consultations with her treating physicians. However, Dr. McPhee phoned the offices of Drs. Bearb and Woods. He was told the physicians were unavailable but spoke with their staffs and questioned

them concerning Plaintiff's treatment. It appears Dr. Schnur made no effort to consult, although this is perhaps understandable given that Plaintiff's treating physicians, who were not mental health professionals, merely recognized potential psychological issues and suggested she see someone in that area of expertise.

The remaining reviewers attempted to contact Flatt's treating physicians but were unsuccessful. Dr. Rubin reported that he called Drs. Bartz and Bearb on June 25, 27 and 29, 2012. (AR 000513.) While he "left callback information," there is no evidence that he advised the physicians of the importance of a timely response. His report reflected that it was dictated on July 4, 2012, mere days after making the calls. (AR 000514.) Dr. Wagner's review indicated that she phoned Dr. Bearb on October 15 and 16, 2012, and left at least one "detailed" voicemail message. (AR 000468.) Her report was dated October 19, 2012. (AR 000470.) As with Dr. Rubin, there is no evidence as to the content of the message.

Clearly, an examiner does not have to wait indefinitely for a response. He or she must, however, "wait a reasonable amount of time and establish that the treating physicians were informed of the importance to their patient of a prompt reply." *Cooper*, 486 F.3d at 168. In *Cooper*, the examiner issued his report four days after his first call to the treating physician and one day after his second. *Id.* Under such circumstances, the Sixth Circuit found that the plan administrator's reliance on the examiner's report was arbitrary and capricious.[7] *Id.* at 168-69.

---

[7]Flatt relies heavily on *Cooper* in support of her contention that Aetna's decision should be overturned as arbitrary and capricious. However, circumstances existed in that matter that are not present here. In *Cooper*, the plan, as is the case here, provided that the administrator may have a participant examined by a physician at its own expense and it chose not to. *Cooper*, 486 F.3d at 167. The insurer's reviewers, Drs. Graulich and Sassoon, were specifically instructed by the plan administrator to interview the claimant's attending physicians. *Id.* at 168-69. Dr. Graulich attempted to contact Cooper's doctors but gave up after four days and filed his report. *Id.* at 168. He also misstated the exertion level of Cooper's job and contradicted himself as to her ability to perform full-time work. *Id.* at 168-69. Dr. Sassoon noted in his report that he contacted one of her doctors on two occasions but "did not achieve successful communication

Here, Drs. Rubin and Wagner waited only a few days after contacting Plaintiff's treating physicians before filing their reports. In addition, there is no evidence from which the Court may infer that the treating physicians were made aware of the need for a quick response. This factor might weigh in favor of an arbitrary and capricious finding but for the Sixth Circuit's admonishment that courts are to focus on whether the ultimate decision to deny benefits, rather than discrete acts by the administrator, was arbitrary and capricious. *See Judge*, 710 F.3d at 660. Based on the Court's conclusion that the ultimate decision was not arbitrary and capricious, a finding for the Plaintiff on this point does not militate judgment in her favor.

Flatt further submits that Dr. McPhee mischaracterized the SSA determination. As previously noted, the physician stated in his review that "[w]hen the claimant was evaluated for Social Security Disability, the letter of approval noted that her back condition was not severe enough to keep her from working although an award was made possibly based on psychiatric conditions." (AR 000751-74.) Defendants acknowledge that this statement was likely a misunderstanding by the physician of the SSA's explanation of determination. In any case, the SSA approval letter itself was before the plan administrator and there is nothing to suggest Aetna relied upon any misreading of the communication by Dr. McPhee in denying benefits.

In addition, the claimant asserts that the denial of benefits was arbitrary and capricious on the grounds that Aetna failed to consider the SSA award in making its decision.[8] Benefit determinations by the SSA "follow a different set of procedures than ERISA claims because the

---

with the office," without explaining exactly what that meant. *Id.* at 169-70. Other doctors he did not attempt to contact at all. *Id.* He then proceeded to summarize the parts of the file favorable to the insurer, omit the unfavorable portions, and conclude there was insufficient evidence of disability. *Id.* Neither reviewing physician provided any explanation as to why the information in Cooper's file, including test results and statements from her doctors, that she was unable to work was insufficient to support a finding of disability. *Id.*

[8]The record contains only the SSA's decision letter to Flatt.

procedures are designed to meet the need of efficiently and uniformly administering a large system." *Raskin v. UNUM Provident Corp.*, 121 F. App'x 96, 101 (6th Cir. 2005). ERISA is not required to follow those procedures. *Id.* Nor is an ERISA plan administrator bound by an SSA decision. *Wooden*, 511 F. App'x at 484. Rather, the plan administrator has "discretionary authority to determine eligibility for benefits governed by courts['] examination of benefits denials under the arbitrary and capricious standard of review." *Smith v. Fed. Exp. Corp. Long Term Disability Plan*, 991 F. Supp. 2d 992, 997 (W.D. Tenn. 2014) (internal quotation marks omitted). Moreover, "although a court must give special weight to the opinions of a claimant's treating physician in social security cases, the same deference does not apply to disability determinations under employee benefit plans governed by ERISA." *Oliver v. Aetna Life Ins. Co.*, ___ F. App'x ___, 2015 WL 4153628, at *6 (11th Cir. July 10, 2015) (per curiam) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003)). Courts are nonetheless entitled to "factor in the plan administrator's failure to give consideration to the Social Security Administration's determination that a claimant was totally disabled." *Wooden*, 511 F. App'x at 482 (quoting *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006)). While a failure to adequately explain a contrary SSA finding is "obviously a significant factor, it does not render the decision to deny benefits arbitrary per se." *Id.* at 485 (internal quotation marks omitted). That is, a plan administrator's failure to give due consideration to the SSA's determination will not render its denial of benefits arbitrary and capricious where the overall decision was the result of a deliberate, principled reasoning process and supported by substantial evidence. *See id.* at 482 ("Alcoa's cavalier treatment of Wooden's SSA determination weighs in favor of finding Alcoa's denial of benefits to be arbitrary and capricious. The review of the medical evidence . . ., however, [does] not. Accordingly, we cannot conclude that its decision to terminate Wooden's

benefits was arbitrary and capricious."). This Court has determined that the overall decision of Aetna in this case was reasonable and supported by substantial evidence. Aetna acknowledged the SSA determination and provided an explanation for its failure to reach the same conclusion. Even if its consideration of the agency award was inadequate, such failure did not render the ultimate decision to discontinue benefits arbitrary and capricious.

Flatt next claims that the decision was arbitrary and capricious because Aetna failed to collect medical records from JMCGH despite the fact that she provided executed release authorizations for such records. However, she has not challenged the insurer's assertion that it sought the records, that the hospital demanded payment therefor, that Aetna was not permitted under company policy to pay for them and that she was aware of the situation. As it was her responsibility to marshal evidence to support her claim, Flatt has offered no explanation for why she did not, or could not, obtain the records herself and submit them to Aetna.

Plaintiff also faults the insurer for failing to obtain and review records considered by the SSA, specifically, those from Dr. Woods; McNairy Regional Hospital; The Jackson Clinic; Dr. Herron, an ophthalmologist; Prime Care Medical Center and JMCGH. Flatt sought benefits under the Plans for a disability beginning in 2012. According to the record, most of the materials reviewed by the SSA were from prior years. The only medical documentation relied on by the SSA from 2012 included information from Flatt's pharmacy; Dr. Woods' February 7, 2012, letter; Dr. Bartz's records through January 23, 2012; and JMCGH documents through January 16, 2012. There is nothing to suggest that the pharmacy records are of any particular relevance to this case. The records from Drs. Woods and Bartz were reviewed by Aetna. The Court's previous discussion concerning the JMCGH records applies equally here and need not be repeated. The Court further notes with respect to this claim that Flatt told Aetna that she began

seeing Dr. Bearb at JMCGH in March 2012. Thus, it appears the SSA did not possess or review his records.[9]

Finally, Flatt maintains that the determination was arbitrary and capricious because Aetna failed to give proper consideration to the physical and mental demands of her occupation. However, internal claim notes from March and July 2012 clearly indicated consideration of her job duties in connection with extensions of STD benefits. As the Court has previously concluded, however, Aetna's finding that updated medical evidence did not support disability was not arbitrary and capricious.

## CONCLUSION

For the reasons articulated herein, Aetna's denial of STD and LTD benefits was not arbitrary and capricious. Accordingly, judgment shall be entered in favor of the Defendants.

IT IS SO ORDERED this 13th day of October 2015.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[9]As noted above, the SSA letter suggested that examinations, including psychological testing, were conducted in April 2012. Plaintiff made no mention of the examinations or any reports the SSA may have possessed concerning the testing in her brief. Thus, the Court will not consider them in connection with this appeal of the denial of benefits.